UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

LINDA WILSON,

    *Plaintiff*,

vs.

CORTLAND MANAGEMENT LLC,
CORTLAND HOLDINGS LLC

    *Defendant.*

No. _____

COMPLAINT

JURY DEMANDED

## I.    NATURE OF ACTION

1.    This is an action seeking redress for the violation of rights guaranteed to the plaintiff by the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (sometimes referred to as the "ADEA").

2.    Plaintiff is a fifty-four-year-old American citizen and Texas resident who seeks equitable and monetary relief under the ADEA, including back pay, value of benefits and all other appropriate relief to which she is entitled under the law, against Defendant, her previous employer who terminated her employment.

3.    Plaintiff further brings suit for breach of contract, a state law claim, pertaining to a severance agreement. Plaintiff seeks to have the Court exercise pendent jurisdiction over this state law related claim involving the same parties.

## II.    JURISDICTION

4.    Because this case is brought under the ADEA, 29 U.S.C. § 621 *et seq.*, this Court has federal question jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(4).

5.    This Court has supplemental or pendent jurisdiction over Plaintiff's state law breach of contract claims pursuant to 28 U.S.C. § 1367, which permits a federal district court to exercise supplemental jurisdiction over state-law claims that are part of the same case or controversy as the claims over which

the court has original jurisdiction.  28 U.S.C. § 1367(a).

6. Plaintiff worked for Defendant at an apartment complex located in Collin County and the Eastern District of Texas.

7. Venue is proper in the Eastern District because all or part of the events giving rise to Plaintiff's claims arose in the Eastern District of Texas and that a substantial part of the acts and omissions giving rise to the claims occurred in this District.  Venue also is proper in this District because Defendant is subject to personal jurisdiction therein by virtue of its substantial, continuous, and systematic commercial activities in this District. See 28 U.S.C. § 1391(b), (c). Because Defendant is subject to personal jurisdiction in this Division, it "resides" in this Division for venue purposes (see 28 U.S.C. § 1391(c)).

8. Plaintiff has satisfied all conditions precedent to initiating this court action in that:

    a. Plaintiff timely filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 450-2020-03919;

    b. The EEOC was not able to resolve the controversy; and

    c. The EEOC issued a "right-to-sue" letter to Plaintiff in EEOC Charge No. 450-2020-03919, dated May 19, 2021, informing and advising Plaintiff that it was unable to resolve the controversy as described to it and that it was not prepared to take further efforts.

9. Plaintiff timely files this action in this Court following receipt of the right-to-sue letter as this Complaint is filed within the time limit permitted by law.

### III. PARTIES

10. Plaintiff Linda Wilson, (hereinafter "Plaintiff" or "Ms. Wilson") is an American citizen and a resident of Denton County, Texas who is presently fifty-four years of age.  At the time of the alleged wrongful conduct by Defendant, Plaintiff was fifty-two years of age.

11. Defendant Cortland Management, LLC, dba Cortland (hereinafter "Defendant" or "Cortland") is a

corporation organized under the laws of the State of Georgia with its principal place of business located in Atlanta, Georgia and has approximately 1,800 employees. At all material times herein, Defendant was engaged in the business of operating apartment complexes, doing business under the name of Cortland and located in Richardson, Texas.

12. Defendant Cortland Holdings, LLC, dba Cortland (hereinafter "Defendant" or "Cortland") is a corporation organized under the laws of the State of Georgia with its principal place of business located in Atlanta, Georgia. At all material times herein, Defendant was engaged in the business of operating apartment complexes, doing business under the name of Cortland and located in Richardson, Texas.

13. Cortland is a conglomerate of Cortland Holdings, LLC, Cortland Management, LLC f/k/a CORTLAND MANAGEMENT, LLC and a number of other companies generally having Cortland in its name. These companies d/b/a simply as "Cortland" and are all interrelated or wholly owned subsidiaries or are parent companies. However, irrespective, companies making up "Cortland" draw no distinction amongst themselves, share one website and often fail to indicate "Inc" or "LLC" as they simply refer to themselves as "Cortland." Cortland Holdings, LLC has disseminated literature to employees which makes it seem that the employees work for this company when working for Cortland. Plaintiff is one of those people. However, on the other hand, Cortland Management LLC is the company which participated in teh EEOC administrative proceedings with Plaintiff and has represented that it is in fact the actual employer of the property managers to include the previous employer of Plaintiff. Therefore, Plaintiff anticipates coming to an agreement with Cortland as to who the actual employer was. Therefore, Plaintiff pleads and anticipates that the proper name of the Cortland company may need to be substituted in this case pursuant to Rule 21 of the Federal Rules of Civil Procedure. Cortland, a company the employees refer to when speaking of the entity which owns, manages and operates the Cortland properties, appears to to be a conglomerate of companies with the same principal owners, a partnership, unincorporated association,

private corporation, or group of individuals doing business under an assumed name or dba and therefore may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right and Plaintiff asks that the court on its own motion or upon motion of any party substitute the true name of this proper Defendant.

### IV.   FACTS

14. Ms. Wilson began her employment with Pure US Apartments REIT, Inc. a/k/a Pure Property Management (hereinafter "Pure") on or about October 5, 2005.

15. By all accounts, Wilson performed her job well for over fourteen (14) years, and on or about May 31, 2018, Pure made a written commitment and an "amendment" to Ms. Wilson's file which was effective on that same date.

16. The "commitment" or agreement provides for specific compensation to Ms. Wilson, an apartment manager, if she is terminated without cause or if she left employment for good reason after a change of control.

17. It provided Ms. Wilson with a monetary safety net should there be a change in control and her services were no longer desired.

18. A change of control took place in October of 2019 with Cortland's acquisition of Pure; a 1.2 billion dollar transaction.

19. During transitioning times, the agreement facilitated loyalty of the employees as well as dedication by the employees including Ms. Wilson, to the incoming company, Cortland.

20. Wilson, as she had done for more than fifteen (15) years, worked diligently and was committed to her new employer, Cortland.

21. However, soon after taking control, it was apparent that Cortland management was not committed to many of Cortland's "older" employees, including Ms. Wilson.

22. The "old age" of the Pure managers was a "problem" for Cortland.

23. As Cortland director of operations, Trey Lopez, often told the previous Pure managers, Cortland prided itself on being a "millennial company".

24. After a number of incidents over a short period of time clearly designed to contrive a "for cause" basis for termination, Cortland terminated Ms. Wilson on April 6, 2020 on fabricated and disingenuous grounds.

25. First, during the Performance Improvement Plan ("PIP") meeting on March 24, 2020, Meredith Smith ("Smith"), a district manager over the apartment managers including Ms. Wilson, discussed some matters with Ms. Wilson; however, she did not yet provide Ms. Wilson with the "Plan."

26. Smith, in the PIP meeting, discussed normal operations topics.

27. At the end of the PIP meeting, Smith asked Wilson to sign the PIP document without reading it to Ms. Wilson or permitting Ms. Wilson to read it.  Smith was rather casual about it, simply telling Ms. Wilson that she needed to sign it.

28. Ms. Wilson signed the document expecting that it would reflect the items discussed and that she would receive a copy of it after signing it.

29. However, after signing the PIP document, Smith neglected to have a copy made and did not provide a copy as Ms. Wilson had expected and trusted she would.

30. Ms. Wilson asked Smith for a copy at least twice and even told Smith that she could make the copy for her.  After all, the PIP meeting took place at the management office of the complex Ms. Wilson managed which had a working copier.

31. Oddly, however, Smith still left the meeting and the apartment complex without providing Ms. Wilson with a copy and merely stated to Ms. Wilson that she would email a copy to Ms. Wilson.

32. For a couple of days after the PIP meeting, Ms. Wilson emailed Smith requesting a copy of the PIP

she had signed.

33. Due to her persistence, Smith emailed the PIP document signed by Ms. Wilson on March 26, 2020 which was the first opportunity Ms. Wilson had to read it.

34. Ms. Wilson was shocked when she read the PIP document as none of the items listed on it were discussed in the meeting with Smith; not one of them.

35. Approximately ten (10) days after emailing the PIP document, Smith terminated Ms. Wilson's employment. Smith met with Ms. Wilson on March 24, 2020, emailed her for the first time the PIP document on March 26, 2020 and terminated Ms. Wilson on April 6, 2020.

36. Cortland's Handbook, on page 22, under "coaching and corrective action" states:

> "The specific circumstances dictate the level of action taken – up to and including immediate separation. The intent of corrective action is to formally document problems while providing the associate with a reasonable time within which to improve performance. The process is designed to encourage development by providing associates with guidance in areas that need improvement such as poor work performance, attendance problems, personal conduct, general compliance with Cortland's policies and procedures, and/or other disciplinary problems. Managers should consult a Talent representative prior to any recommendation of separation."

37. Cortland violated this provision of the Cortland Handbook as it pertains to Ms. Wilson as the timing of the meeting and termination was not "a reasonable time within which to improve performance".

38. Furthermore, the actions of Smith were directly in contravention to a process to encourage development when Smith intentionally failed to discuss any of the items listed in the PIP document in the March 24 meeting with Ms. Wilson.

39. The fact that Smith failed to address what was in the Plan she eventually provided to Ms. Wilson after multiple requests and shortly thereafter terminating Ms. Wilson alone brings into question Smith and Defendant's true motive.

40. On March 25, Ms. Wilson asked for the signed PIP plan document and stated that she needed to know what to focus on for her individual growth.

41. Originally, Smith was scheduled to meet with Ms. Wilson again on April 3 to provide coaching.

42. However, that meeting, originally scheduled for April 3, was moved back to April 6 by Smith.

43. The PIP provides that there is to be improvement over the next thirty (30) days, however Smith did not wait until April 24 and terminated Ms. Wilson on April 6, the pushed back coaching meeting.

44. Ms. Wilson was not provided a reasonable opportunity by Smith and Cortland because Smith was merely fabricating a basis for termination and had no intention of coaching Ms. Wilson or permitting any improvement over the fabricated items which Smith never even discussed with Ms. Wilson and had her sign without permitting her an opportunity to read them.

45. Cortland is exposed for fabricating a basis for termination. For example, Cortland complains in the Performance Improvement Plan under failure to follow directives, dated 2/10/20, that Ms. Wilson, as Property Manager, was somehow at fault for requiring her staff to follow a formal chain of command and report issues and problems on the property to her first before going up the chain of command.

46. Not only is this a proper business practice followed and expected by the majority of businesses in the United States, but it is in Cortland's own policy as well.

47. On page 23 of Cortland's Handbook, under "open-door policy", it states:

> "Cortland encourages an open line of communication between associates and management. You are encouraged to raise your work- related concerns with your immediate supervisor as soon as possible after the events that cause the concerns. We believe that such concerns are best addressed through informal and open communication. If you believe that your immediate supervisor is not the appropriate person with whom to raise such matters, you are encouraged to bring your concerns to the attention of your second- level supervisor or the Talent team as soon as possible."

48. Cortland reprimanding Ms. Wilson for acting within and in accordance with Cortland's own policies is further evidence of the intentional fabrication of a basis to terminate Ms. Wilson.

49. Another incident alleged by Cortland on February 17, 2020, involving failing to respond to a complaint by a tenant is another incident where Cortland stretches the truth and their own policy beyond

its bounds in order to fabricate a basis to terminate Ms. Wilson.

50. First, it was the assistant manager's responsibility to handle that complaint, not Ms. Wilson's, by company policies and practices.

51. More importantly demonstrating the extreme unfairness with the matter and the great lengths Cortland was going to in order to paint Ms. Wilson in a false light, Ms. Wilson was on vacation from February 18 through February 23. Cortland disciplined Ms. Wilson and relied upon this instance to terminate her fully knowing that she was on vacation and another employee was responsible to handle the tenant complaint. Defendant raised the bar every other manager is placed against in order to fabricate another basis to terminate Ms. Wilson.

52. Another clear example of the unfair, unequal and illegal treatment of Ms. Wilson occurred on March 17, 2020. Allegedly, there were open tenant requests which went unresponded to in a timely fashion.

53. Very similar emails regarding the same matters were also delivered to other apartment managers. However, despite the same criticism of multiple managers, only Wilson received discipline for the matter while the others did not. This is a clear example of unfair treatment. The other managers were younger than Ms. Wilson.

54. Another alleged basis for disciplinary action and termination of Ms. Wilson is the fabricated accusation of gross mismanagement of funds claiming Ms. Wilson overspent in the month of March.

55. There are valid justifications well recognized in the industry for the charges. Furthermore, Cortland was aware of and approved of the charges including necessary emergency repairs due to torrential rains which flooded many apartments.

56. Cortland cannot have it both ways, complaining of Ms. Wilson's failure to respond to tenant complaints timely and in a manner where the tenant is satisfied on the one hand while complaining about

Mrs. Wilson's necessary and required expenditures on repairs and costs associated with acts of God and which are required by law for the landlord to perform and which are necessary to keep the tenants satisfied and without complaints.

57. During a company meeting after Cortland acquired Pure, an investor with the company made negative remarks about older employees and Cortland's desirability to have younger employees. This investor was outwardly expressing an unlawful below the surface policy at Cortland.

58. Other older Pure employees were also targeted for termination and harassment after Cortland acquired Pure; some fired and some forced out by an array of efforts employed by Cortland for this purpose all within a relatively short period of time after Cortland acquired Pure.

59. To add insult to injury, Cortland refused to honor the "commitment" agreement Ms. Wilson earned after fourteen (14) years of loyal service to the previous company, Pure, and which Pure rewarded her with.

60. Under the agreement, Ms. Wilson is entitled to a lump sum payment. Cortland was required to pay approximately $26,741.86, as Ms. Wilson was not terminated for cause. This amount was arrived pursuant to the terms of the agreement and by taking Ms. Wilson's accrued vacation time $7,268.41 (201.06 hours X $36.15); Ms. Wilson's prorated base salary for three months $18,798.25 (3 x $6,266.08/ $18,798.25, her monthly salary); and the prorated annual cash bonus $675.20 (96 days based upon three previous years annualized average or 96 x $7.03 per day).

### V. CAUSES OF ACTION

### Count One - ADEA Wrongful Discharge

61. On or about October 2018, Defendant acquired Pure and on this date Plaintiff commenced employment with Defendant in the position of Apartment Manager.

62. Up to the time of the wrongful discharge, Plaintiff performed her duties and functions as an

Apartment Manager for a period of fifteen (15) years, in outstanding fashion and without any legitimate disciplinary action.

63. In fact, at the time of her discharge, Plaintiff was a Property Apartment Manager employed by Defendant, managing other employees.

64. On April 6, 2020, Plaintiff was terminated from her employment with Defendant.

65. At the time she was discharged, Plaintiff was fifty-two years of age and had been in the continuous employment of Defendant and the predecessor company to Defendant for approximately fifteen (15) years.

66. At the time of the discharge, Plaintiff's salary was approximately $75,193.02 per year.

67. Defendant provided the reasons for Plaintiff's discharge, including those stated above. The foregoing factual paragraphs are incorporated hereinafter as if set forth verbatim.

68. In fact, up until the moment of her discharge, Plaintiff earnestly complied with all of Defendant's rules and policies as those rules were explained to her by Defendant's representatives and those in the Handbook.

69. The reason given to Plaintiff for her discharge was pretextual. Plaintiff was actually discharged so that Defendant could hire new property managers at their properties who were much younger than Plaintiff and so that Defendant could have a more "millennial" appearance.

70. Other younger employees of Defendant have committed acts in violation of Defendant's rules and policies that were far more serious than those alleged to have been committed by Plaintiff. Those employees, however, have not been disciplined in any fashion whatsoever.

71. Moreover, Defendant intentionally constructed a fabricated basis to terminate Plaintiff so as to make it look like a legitimate reason when in fact it is due to her age.

72. Defendant also took actions in violation of its own Handbook and disciplined Plaintiff contrary to

Defendant's own policies and the Handbook.

73. As a result of the arbitrary and capricious acts of Defendant, Plaintiff suffered grievous harm, including, but not limited to, substantial loss of income and loss of benefits.

74. Defendant's acts constitute unlawful discrimination against Plaintiff because of her age, in violation of the provisions of the Age Discrimination in Employment Act, *29 U.S.C. § 621 et seq.*

75. Defendant wrongfully discharged Plaintiff in violation of the AEDA due to her age.

### Count Two - Breach of Contract

76. Plaintiff had a valid and enforceable commitment agreement with Pure.

77. Pure was purchased by Defendant and Defendant acquired Pure, including Plaintiff as an employee along with the commitment agreement providing Plaintiff with a severance should she be terminated without cause.

78. Defendant breached this agreement by failing to pay Plaintiff the agreed upon amounts under the agreement. As a result, Plaintiff suffered harm.

79. Defendant failed to act in good faith under this agreement by fabricating for cause termination.

80. Plaintiff is entitled to recover reasonable and necessary attorney fees under Texas Civil Practice & Remedies Code chapter 38 because this is a suit for breach of written contract. Plaintiff retained counsel, who presented plaintiff's claim to Defendant. Defendant did not tender the amount owed within thirty (30) days after the claim was presented.

## VI.    DAMAGES

81. Plaintiff brings this action for damages directly and/or proximately caused by Defendant's actions and/or omissions complained of herein and seeks the following damages:

   a. Actual damage in the past and future;

   b. Mental anguish in the past and future;

    c.      Lost wages and salary in the past and future;

    d.      Loss of benefits in the past and future;

    e.      Economic damages and payment s due under the commitment contract;

    f.      Attorney's fees;

    g.      Court costs;

    h.      Pre and Post judgment interest;

    i       Exemplary damages; and

    k.      Humiliation, embarrassment and undue emotional stress.

## PRAYER

Plaintiff requests that the Court assume jurisdiction and after trial, award Plaintiff with actual damages, consequential damages, exemplary damages together with attorney's fees and costs of court and pre and post judgment interest as allowed by law and for any and all further relief to which Plaintiff shows herself justly entitled.

Dated: August 17, 2021

Respectfully submitted,

**MATHIAS RAPHAEL PLLC**
13601 Preston Road, Suite W217
Dallas, Texas 75240
Office: 214-739-0100
Facsimile: 214-739-0151
Damon@mrlaw.co
Ori@mrlaw.co

BY:   /s/ Damon Mathias
        Damon Mathias
        State Bar No. 24080170
        Ori Raphael
        State Bar No. 24088273

**ATTORNEYS FOR PLAINTIFF**